***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman and the briefs and arguments on appeal. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on July 11, 2002 as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. All parties are properly before the Industrial Commission, and the employee was employed by the City of Asheville on May 31, 2001.
3. The City of Asheville is self insured and its workers' compensation program is administered by Hewitt Coleman Associates, Inc.
4. There is no issue regarding the employer-employee relationship on the date of the alleged injury.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records and reports.
2. Packet of Industrial Commission forms.
The Pre-Trial Agreement and Addendum dated July 11, 2002 which was submitted by the parties are incorporated by reference.
 ***********
Based upon the competent evidence of record reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Daryl Earl Ingram was a loyal employee of the City of Asheville who spent his entire working life lifting and throwing garbage and trash into a garbage truck. A heavy continuous repetitive use of his arms resulted in arm problems. A specific traumatic incident resulted in neck problems. An unsympathetic employer fired him while he was recovering from neck surgery when he did not return to work with a doctor statement releasing him to full unrestricted duties.
2. Plaintiff, who was 35 years old at the time of the hearing before the Deputy Commissioner and who is a high school graduate, began working for defendant on February 1, 1999 as a sanitation worker. His job duties included riding on the back of a garbage truck, picking up household trash, and emptying it into the truck. He also picked up yard brush and debris one day each week. There were from 750 to 1000 homes on each trash route, and the sanitation workers were expected to be able to lift up to one hundred pounds.
3. While working throwing garbage and trash he started having tingling in his forearms going down into his fingers. He also had problems with his elbow. His arms would bother him. He would be able to do his job during the day and then arm pain would bother him at night. He would have to hold his arms straight out to keep them from hurting so that he could sleep at night to be able to go to work the next day. The doctor on contract to the city gave him an arm brace and some Motrin and told him to go back to work.
4. On May 31, 2001, the pain got so bad that he had to go to the emergency room. The city physician just kept telling him to take Motrin. The Motrin did not help. The emergency room personnel referred him to Blue Ridge Bone and Joint. The doctor at Blue Ridge Bone and Joint put him on light duty, faxing the order to the city. However, the city did not put him on light duty but put him right back on a garbage truck.
5. Later, the city said it had no light duty and asked him to call in every day to see if they had anything for him to do. He called but was told there was no light duty and he had to use his vacation and sick pay in order to have income.
6. Around mid-December plaintiff hurt his neck on the job, picking up and throwing trash and garbage into the truck. He thought it was a crick and tried to get a fellow employee to massage away the pain. That did not work. He had to work despite the pain because his family had to be fed. This incident amounted to a specific traumatic incident of the work assigned.
7. On December 31 his neck pain got so bad that he tried unsuccessfully to see Blue Ridge Bone and Joint on an emergency basis. He had to settle on seeing his family doctor at Family Community Practice.
8. At one time the City of Ashville said of Daryl Ingram, "You are an excellent worker and an asset to the department when you are here. It is our sincerest intention to keep you employed with the city because of your strong work ethic."
9. The city's contracted doctor, Dr. Paul Martin, M.D., grudgingly admitted on cross-examination that a person who repetitively lifts heavy objects would be at a greater risk than the general population for developing musculoskeletal complaints. There was no question but that the repetitive use of his arms in his job caused his upper extremity problems. Plaintiff did try to lift weights one weekend to build body strength. He had a temporary membership in a gym and never worked out with more than 10 pounds at a time during his short tenure at the gym. The greater weight of the evidence supports finding that his arm problems resulted from his work.
10. Dr. Michael Goebel, the doctor at Blue Ridge Bone and Joint who testified concerning Daryl Ingram's treatment there, at first resisted saying plaintiff's neck problems resulted from a specific traumatic incident at work because his patient did not tell him of such. However, he was asked if Daryl Ingram's testimony was that he first felt neck pain in mid December while picking up and throwing garbage and trash whether that specific traumatic incident was more likely than not the aggravation that caused his theretofore non-symptomatic degenerative cervical spine to become severely symptomatic and disabling. He answered that it could have indeed have "been the cause of the condition, with the stipulation that he has underlying degeneration of the disc anyway."
11. Daryl Ingram has proven that he suffered compensable arm and elbow disabilities resulting directly from his employment, that the same constituted an occupational disease under the Workers Compensation Act, that he suffered a disabling specific traumatic incident of the work assigned in mid December that disables him to this day, and that he is entitled to workers compensation benefits.
12. By February 2000 plaintiff was experiencing some intermittent tingling and numbness down his upper arm into his forearm. He mentioned these symptoms to Dr. Martin, the city doctor, on February 1, 2000 when he saw the doctor for a lipoma on his arm. In early 2001 he began to develop pain in his elbows. After trying to ignore it for several months, he mentioned it to his family doctor, Dr. Haaksma, on May 11, to the city nurse May 31 and then to Dr. Martin on June 7, 2001. Dr. Martin treated him with anti-inflammatory medication and ultimately diagnosed his condition as epicondylitis related to overuse from his job.
13. Plaintiff then went on leave from work for about six weeks beginning in August. He apparently did not receive further treatment for his elbows until September 26, 2001 when he saw Dr. Haaksma again. Dr. Haaksma sent him to physical therapy and prescribed medication for him. On October 20, 2001 plaintiff went to the emergency room with complaints of pain in both elbows and numbness in his fingers, which symptoms were worsening despite physical therapy and were waking him up at night. The emergency room physician referred him to an orthopedic surgeon. Consequently, he went to Dr. Cammarata on October 26, 2001 and described bilateral elbow pain, which was worse on the right side, and paresthesias in his right ring and little fingers. Dr. Cammarata's impression was that plaintiff had medial epicondylitis and cubital tunnel syndrome, so he injected plaintiff's right elbow and cubital tunnel with steroid medication. At the return visit, plaintiff indicated that the injections had helped for a while but that the pain had been returning. Consequently, Dr. Cammarata repeated the injections.
14. The next medical treatment plaintiff received was from Dr. Dedman in Dr. Haaksma's office. He saw her on December 31, 2001 and described being in a lot of pain, but he indicated that his primary pain was now in his neck, and that it hurt to turn his head to the right. There was also numbness from his armpit down his arm to his fourth and fifth fingers. Dr. Dedman thought his symptoms represented a radiculopathy as well as some ulnar entrapment. She agreed that an MRI should be performed. Plaintiff underwent the tests and then returned to Dr. Cammarata on January 14, 2002. Dr. Cammarata reported that the pain in the elbows had resolved after the second injections and that plaintiff was in with a new complaint of neck pain with bilateral upper extremity pain and paresthesias. He reviewed the MRI and recommended that plaintiff see Dr. Goebel, the spine specialist in his office. Consequently, plaintiff went to Dr. Goebel the next day. Dr. Goebel noted complaints of symptoms for six to seven months with no reported specific injury. He examined plaintiff and reviewed the MRI and x-rays which had been performed and which appeared to show spondylosis and neuroforaminal stenosis at C5-6. He then advised plaintiff that the symptoms appeared to be related to the spondylosis. The doctor gave plaintiff an option of having surgery if and when the symptoms were sufficiently severe.
15. Plaintiff subsequently elected to undergo the operation, so on February 4, 2002 Dr. Goebel performed surgery to decompress and fuse the C5-6 interspace. Dr. Goebel subsequently followed plaintiff's recovery and noted significant improvement in the symptoms as a result of the operation.
16. Plaintiff advised his doctors that he believed his symptoms were related to his job. He clearly had a strenuous job which involved a great deal of lifting.
17. The medical treatment discussed in this Opinion and Award was reasonably designed to effect a cure, provide relief, or shorten the period of disability.
18. The parties failed to present evidence or stipulate to plaintiff's average weekly wages. However, defendant's Form 19 showed an average weekly wage of $388.80, which would result in a compensation rate of $259.20.
19. As a result of his occupational disease, plaintiff was unable to work for various periods of time in the year 2001. Since this was a denied claim, plaintiff was forced to use his vacation and sick pay. He is entitled to the compensation at the rate of $259.20 for each week he was out of work due to his occupational disease, including those weeks when he was forced to use his vacation and sick pay.
20. As result of his specific traumatic incident, plaintiff has been unable to work from December 28, 2001, to the present and continuing. His termination by the city on May 22, 2002, resulted from his absences from work caused by his compensable occupational disease and specific traumatic incident and does not constitute a constructive refusal to work.
21. After his surgery and after being released by Dr. Goebel, plaintiff applied for work at three to four potential employers each week. He applied at area hospitals, Grove Park Inn and various restaurants, including Rio Bravo and the Red Lobster. He has also followed the job listings at the Employment Security Commission from whom he drew unemployment benefits.
22. Defendant is entitled to appropriate credit for those periods of time when plaintiff either drew unemployment benefits or was able to find temporary work.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's upper extremity problems were caused by his job, which placed him at an increased risk of contracting such problems as compared to the general public. Those problems constituted an occupational disease. N.C. Gen Stat. § 97-53(13). Plaintiff is entitled to disability compensation for those periods of time when he was unable to work because of his occupational disease. N.C. Gen Stat. § 97-29. Plaintiff is also entitled to medical compensation for the treatment he undertook as result of his occupational disease. N.C. Gen Stat. §97-25.
2. Plaintiff's neck problems, an aggravation of pre-existing but asymptomatic degenerative disc disease, were caused by a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6). Plaintiff is entitled to disability compensation for those periods of time when he was unable to work because of his specific traumatic incident. N.C. Gen Stat. § 97-29. Plaintiff is also entitled to medical compensation for the treatment he undertook as result of his specific traumatic incident. N.C. Gen Stat. § 97-25.
3. Defendant is entitled to an appropriate credit for the unemployment compensation received by plaintiff during his period of disability. Defendant is likewise entitled to an appropriate credit for any earnings received by plaintiff as result of temporary employment. N.C. Gen Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to the attorney fee set forth below, defendant shall pay to plaintiff compensation at the rate of $259.20 per week for each week during the year 2001 (prior to December 28, 2001) when plaintiff was unable to work because of his occupational disease, including those weeks when plaintiff was forced to use his vacation and sick leave in order to feed his family. All such sums having accrued, they shall be paid in a lump sum. An attorney fee of 25% of the lump sum shall be paid directly to the plaintiff's attorney. Interest at the rate of 8% per year from July 11, 2002 until paid to shall be paid to plaintiff.
2. Subject to the attorney fee set forth below, defendant shall pay to plaintiff for his specific traumatic incident compensation at the rate of $259.20 per week for each week from December 28, 2001, to the present and continuing, including those weeks when plaintiff was forced to use his vacation and sick leave in order to feed his family. Such sums as have accrued shall be paid in a lump sum. An attorney fee of 25% of the lump sum shall be paid directly to the plaintiff's attorney. Interest at the rate of 8% per year from July 11, 2002 until paid to shall be paid to plaintiff. Thereafter, weekly compensation shall be paid to plaintiff with every fourth check going directly to plaintiff's attorney.
3. Defendant shall pay for any ongoing medical treatment necessitated by either plaintiff's occupational disease or his specific traumatic incident to the extent such treatment is reasonably designed to effect a cure, provide relief or lessen any period of disability. Defendant shall reimburse appropriate parties for past medical treatment necessitated by either plaintiff's occupational disease or in specific traumatic incident to the extent such treatment was reasonably designed to effect a cure, provide relief or lessen any period of disability.
4. Defendant shall pay the costs.
This 25th day of June 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN